UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DANIEL CASANOVA and TIFFANY §
SAUL, individually and on behalf of all §      No. 5:13−CV−1161−DAE
others similarly situated, §
§
        Plaintiffs, §
§
vs. §
§
GOLD'S TEXAS HOLDINGS §
GROUP, INC., §
§
        Defendant. §

ORDER (1) GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND (2) DENYING DEFENDANT'S MOTION FOR SUMMARY
<u>JUDGMENT</u>

        Before the Court are two motions: (1) a Motion for Partial Summary

Judgment filed by Daniel Casanova and Tiffany Saul, individually and on behalf of

all others similarly situated (collectively, "Plaintiffs") (Dkt. # 64); and (2) a

Motion for Summary Judgment filed by Gold's Texas Holdings Group, Inc.

("Defendant" or " Gold's Gym") (Dkt. # 65).  On March 21, 2016, the Court heard

oral argument on the cross motions: Lawrence Morales II, Esq., appeared on behalf

of Plaintiffs and Carrie Hoffman, Esq., appeared on behalf of Defendant.  After

careful consideration of the supporting and opposing memoranda and the

arguments presented at the hearing, the Court, for the reasons that follow,

1

**GRANTS** Plaintiffs' Motion for Partial Summary Judgment (Dkt. # 64) and

**DENIES** Defendant's Motion for Summary Judgment (Dkt. # 65).

BACKGROUND

This case concerns the applicability of an exemption contained in the

Fair Labor Standards Act ("FLSA"), codified as 29 U.S.C. § 207(i).  Section 207(i)

exempts certain employers from having to pay employees overtime for hours

worked in excess of 40 per week where, *inter alia*, more than half of an

employee's compensation represents commissions on goods or services.  See 29

U.S.C. § 207(i)(2).  The question before the Court is whether the compensation

plan for trainers at Gold's Gym qualifies as a commission under the exemption.

On December 22, 2013, Plaintiffs filed suit on behalf of themselves

and all others similarly situated.  (Dkt. # 1.)  Plaintiffs are past and present

personal trainers employed by Gold's Gym.  (Id.)  Plaintiffs' complaint alleges that

Gold's Gym violated the FLSA, 29 U.S.C. § 201 et seq., by improperly classifying

them and other personal trainers as exempt from the FLSA and not paying them

time and one half for hours worked in excess of 40 hours per week.  (Id. ¶ 1.)  On

November 19, 2014, this Court issued an order granting conditional class

certification.  (Dkt. # 24.)  Subsequently, over eighty individuals have opted into

the conditional class.

Defendant operates forty-one full-service gyms throughout Texas and employs personal trainers to assist gym members improve their physical fitness. ("Copeland Decl.," Dkt # 65-1 ¶ 6−10.)  A trainer's primary responsibility includes "providing customized fitness programs to the customer that include education and guidance on proper nutrition, cardiovascular exercise, resistance training and other programs to help the member achieve their fitness goals."  ("Job Description," Dkt. # 65, Ex. 1-B.)

Trainers are compensated in two different ways.  First, trainers are assigned a certain number of hours per week to work on the floor of the gym. ("Code of Conduct," Dkt. # 64, Ex. 1.)  These hours are commonly referred to as "floor hours" or "blue hours."  ("Copeland Dep.," Dkt. # 64, Ex. 3 at 11:6−25.) For each hour worked on the floor, the trainer receives a fixed hourly rate.  (Code of Conduct.)  During floor hours, a trainer performs a variety of tasks that include assisting gym members while they work out, re-racking weights, completing administrative work, assisting in selling personal training sessions to gym members, and conducting gym orientations for new members.  (Copeland Dep. at 78:2−13.)  Each gym, however, has a limited number of "floor hours" based on budget constraints.  (See Copeland Dep. at 61−62.)  Generally, "floor hours" comprise a relatively small amount of a trainer's overall compensation package.

The primary basis of a trainer's compensation comes from conducting personal training sessions with members.  (Code of Conduct.)  Under this portion of the compensation package, trainers receive a percentage of the price charged to a gym member for each personal training session that the trainer actually conducts. (Code of Conduct.)  The only exception to this compensation scheme, whereby a trainer receives a percentage of the training session price without conducting a session, occurs where the member cancels the session within a 24-hour window or the member does not attend the session.  (Copeland Dep. at 24:19−25.)  Otherwise, a trainer must conduct the personal session to earn the percentage of the price.  In general, the length of each session is one hour.  (Id. at 77:3−7.)  Accordingly, the more sessions a trainer conducts, the more that trainer would earn.  (Id. at 26:1−11.)

The price range of a personal training session is set by Gold's Gym, but trainers negotiate within that range with gym members for the actual price charged, based on a variety of factors, including the type of session sold (i.e. a bootcamp, one-on-one, or small group session), the number of sessions a gym member purchases, the trainer's certification level, and whether the gym member is new.  (Copeland Dep. at 22:17−25.)  The percentage that a trainer would receive as compensation for each session is based on two elements: (1) the amount of national certifications and specialty certificates the trainer possessed; and (2) the amount of

sessions a trainer conducts in a bi-weekly pay period.  ("2013 Incentive Pay

Understanding[1]," Dkt. # 65, Ex. 1 at 16.)  In 2013, trainers at Gold's Gym received

the following percentages for sessions they conducted:

| Title | Bi-Weekly Count | | | |
|---|---|---|---|---|
| | Count | Payout | Count | Payout |
| Fitness Coach | Any | 35% | | |
| Fitness Specialist 1 | Any | 35% | | |
| Fitness Specialist 2 | 0-29 | 40% | 30+ | 45% |
| Fitness Specialist 3 | 0-39 | 45% | 40+ | 50% |
| Fitness Expert | 0-49 | 55% | 50+ | 60% |

(Id.)  Trainers earn different titles, and thus a higher percentage of the training

session price, by becoming more skillful.  Gold's Gym set out the following

standards for a trainer to increase his or her earning capacity:

| Title/Classification | Certifications Required |
|---|---|
| Fitness Coach | 1 National Certification |
| Fitness Specialist 1 | 1 National Certification and 2 Specialties |
| Fitness Specialist 2 | 1 National Certification and 2 Specialties |
| Fitness Specialist 3 | 1 National Certification and 2 Specialties |
| Fitness Expert | 2 National Certification and 3 Specialties |

(Id.)  According to this payment structure, for example, a Fitness Expert would

receive 55% of the price paid by a gym member for the first 49 sessions that

Fitness Expert conducted in a bi-weekly pay period.  (Id.)  For each session over

---

[1] The Record includes four separate "Incentive Pay Understanding" documents
from 2009, 2011, 2012, 2013.  (See Dkt. # 65, Ex. 1 at 9−18.) Each year Gold's
Gym changed the titles of various trainers and the percentages earned by each
trainer for servicing a session.  The Court cites the most recent "Incentive Pay
Understanding" because the compensation scheme did not change in a manner
relevant to the application of the exemption found in 29 U.S.C. § 207(i).

50 in a given pay period, that Fitness Trainer would receive 60% of the price paid by the gym member upon conducting that session with the member.  (Id.; Copeland Dep. at 16:6−10.)  Apparent from the charts, trainers can increase the percentage they receive per session that they service by earning more certifications and specialties.

Finally, in addition to being paid in the manner just described, up until 2012, trainers were also eligible to receive a flat percentage of their volume of sales of membership packages and personal training sessions.  (Dkt. 64-2 at 1.) Under this model, trainers did indeed receive a percentage of the sale for a personal training session upon executing the sale.  (Copeland Dep. at 33:18−22.)  However, starting in 2012, Gold's Gym rolled out a new compensation system that stated "[t]rainers are not eligible for sales commissions."  (Id. at 3; see also Copeland Dep. 33:1−25; 34:1−3.)  Under this compensation method, "[a]ll [t]rainers [were] paid for sessions serviced."  (Dkt. # 64-2 at 3.)  Therefore, the only method of compensation for personal trainers was by working "floor hours" at a set rate and servicing personal training sessions at each trainer's relevant percentage rate.

LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P.

Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  "Substantive law will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In seeking summary judgment, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  United States v.

Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of

Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

DISCUSSION

Gold's Gym argues that its compensation plan is a commission

because it is based on a percentage of the amount charged to the customer,

not a flat rate per hour.  (Dkt. # 67 at 10.)  Gold's Gym further argues that its

compensation plan represents a commission, because trainers negotiate the

ultimate price per session with their clients, compensation varies based on a

trainer's certifications, and trainers are incentivized to train more people at

once and charge higher rates.  (Id. at 14.)

Plaintiffs' central argument is that the compensation plan is not

a bona fide commission, because the work is not decoupled from actual time

worked.  (Dkt. # 64 at 8.)  Plaintiffs assert that a true bona fide commission

is solely tied to the amount of sales and that Gold's Gym's compensation

plan is nothing more than an hourly rate disguised as a commission.  (Id.)

The FLSA requires an employer to compensate every employee at a rate

not less than one and one-half times the regular rate at which he is employed for

each hour worked over forty in a given workweek, unless a statutory exception

applies.  29 U.S.C. § 216(a)(1).  One such exception is the "retail or service

8

establishment" exemption.  Id. § 207(i).  This exception exempts an employer from

paying overtime to an employee if:

(1) The employer is a retail or service establishment; and

(2) The regular rate of pay of such employee is in excess of one and
one-half times the minimum hourly rate applicable to him; and

(3) More than half of his compensation for a representative period (not
less than one month) represents commissions on goods or services.

Id.  The statute provides "all earnings resulting from the application of a

bona fide commission rate shall be deemed commissions on goods or

services."  Id.  The employer bears the burden to prove an employee is

exempt under the FLSA; exemptions are narrowly construed.  Cleveland v.

City of Elmendorf, Tex., 388 F.3d 522, 526 (5th Cir. 2004).

I.      Gold's Gym is a Retail-Service Establishment

As a matter of thoroughness, before addressing whether the

compensation scheme is a bona fide commission, the Court will first address

whether Gold's Gym qualifies as a retail or service establishment.  To

determine whether an employer is a "retail or service establishment" for

purposes of the § 207(i) exemption, courts look to the former statutory

definition in Section 13(a)(2) of the FLSA, codified as 29 U.S.C. § 213(a)(2)

(repealed 1989).  Parker v. ABC Debt Relief, Ltd. Co., No. 3:10-CV-1332-P,

2013 WL 371573, at * 8 (N.D. Tex. Jan. 28, 2013) (citing Gieg v. DDR,

Inc., 407 F.3d 1038, 1047 (9th Cir. 2005)); 29 C.F.R. § 779.313.  Section

13(a)(2) defines a "retail or service establishment" as one in which 75% of

the annual dollar volume of sales of goods or services is "not for resale" and

"is recognized as retail sales or services in the particular industry."  ABC

Debt Relief, 2013 371573 at 8; 29 C.F.R. § 779.313.  However, "there is no

'bright line' in determining whether the retail concept exists; instead 'a case

by case approach is in order with the referents being common sense and

common parlance.'"  Collins v. Horizon Training Ctrs, L.P., No. 3:02-CV-

1310-L, 2003 WL 223 88448, at * 5 (N.D. Tex. Sept. 30, 2003)

According to Department of Labor regulations, a retail or

service establishment must have a "retail concept."  29 C.F.R. § 779.316.

The regulations describe "characteristics and examples" of retail or service

establishments:

> Typically a retail or service establishment is one which sells goods or
> services to the general public. It serves the everyday needs of the
> community in which it is located. The retail or service establishment
> performs a function in the business organization of the Nation which
> is at the very end of the stream of distribution, disposing in small
> quantities of the products and skills of such organization and does not
> take part in the manufacturing process . . . It provides the general
> public its repair services and other services for the comfort and
> convenience of such public in the course of its daily living. Illustrative
> of such establishments are: Grocery stores, hardware stores, clothing
> stores, coal dealers, furniture stores, restaurants, hotels, watch repair
> establishments, barber shops, and other such local establishments.

29 C.F.R. § 779.318.

Plaintiffs do not point the Court to, nor can the Court find, summary judgment evidence that Gold's Gym is not a "retail or service establishment."  Gold's Gym, on the other hand, submitted an affidavit by its Senior Vice President of Human Resources in support of its designation as a "retail or service establishment."  (Copeland Aff.)  Copeland attests that Gold's Gym "operates individual gyms which market and sell fitness products and services to the local communities in which they are located," (id. ¶ 6) "sells its products and services . . . [that] are not subject to resale," (id. ¶ 7) and "[o]ne hundred percent of [its] revenue is generated from direct sales of fitness products and services to [its] members."  (Id. ¶ 8.)  Such evidence, especially in light of Plaintiffs offering no contrary evidence, indicates the absence of a genuine issue of material fact.

Plaintiffs assert, however, that the single affidavit of one of Defendant's officers is insufficient summary judgment evidence as a matter of law because the officer is an interested party.  See Hodgson v. Crotty Bros. Dallas, 450 F.2d 1268, 1281 (5th Cir. 1971) (noting in dicta that evidence to show an entity is a "retail or service establishment" requires "disinterested sources, lest member organizations in various industries be permitted to create their own exemptions.")  In Hodgson, the Fifth Circuit affirmed the district court's decision by noting that the relevant statute was

11

"the best disinterested source of all" because it expressly provided that the business entity qualified as a "retail or service establishment." Id. at 1281.

Here, the Department of Labor issued an Opinion Letter indicating that an athletic and fitness club would qualify as a "retail or service establishment" where the club was open to the general public and sold memberships and physical training sessions that were not for resale. U.S Dep't of Lab., Opinion Letter on Fair Labor Standards Act, 2005 3308624, at *1−2 (Nov. 14, 2005). While this opinion letter does not carry the force of law and is not binding on this Court, Christensen v. Harris Cnty, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters . . . which lack the force of law−do not warrant Chevron-style deference."), it is "entitled to respect" to the extent that the letter has the "power to persuade." Id. ("[O]pinion letters are 'entitled to respect' under our decision in Skidmore, but only to the extent that those interpretations have the 'power to persuade'.") (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). Having independently considered the characteristics of Gold's Gym's business, the Court finds that the Department of Labor's opinion letter has the power to persuade because its subject matter and legal conclusion is directly germane to the facts of this case. Similar to the fitness and athletic club subject to the opinion letter, Gold's Gym is open to the

general public and sells memberships and personal training sessions that are not subject to resale.  Therefore, based on the sworn statements made by Defendant's Vice President for Human Resources and the persuasive agency letter, the Court finds that Gold's Gym is a "retail or service establishment."

II.     Compensation Scheme as a Bona Fide Commission

To be exempt under § 207(i), "more than half of [the employee's] compensation for a representative time . . . [must] represent[] commissions on goods or services."  29 U.S.C. § 207(i)(2).  The express language of § 207(i) requires the fee paid to the employee be based on a "bona fide commission" to qualify as a commission under the exemption. Id.  The Fifth Circuit has not answered or considered the meaning of a "bona fide commission" under this section of the FLSA.  Accordingly, it is a matter of first impression in this circuit.

In any statutory interpretation case, the Court starts with the statutory text and, unless otherwise defined therein, interprets the text in accordance with its ordinary meaning.  See D.G. ex rel. LaNisha T. v. New Caney Indep. Sch. Dist., 806 F.3d 310, 316 (5th Cir. 2015).  Here, the Congress did not define "commission" in the FLSA.  According to Black's Law Dictionary, the ordinary or plain meaning of a "commission" would be "a fee paid to an agent or employee for a particular transaction, usu[ally] as a

percentage of the money received from the transaction."  Commission,

Black's Law Dictionary (10th Ed. 2014).  However, the statutory

requirement that the commission be "bona fide" is susceptible to more than

one reasonable interpretation, and is accordingly ambiguous.  See Parker v.

NutriSystem, Inc., 620 F.3d 274, 278 (3d Cir. 2010) ("The 'bona fide

commission rate' language is imprecise and capable of ambiguity.");

Mechmet v. Four Seasons Hotel, Ltd., 825 F.2d 1173, 1175 (7th Cir. 1987)

("[T]he meaning of the word 'commissions' in section section 207(i) is not

clear just from reading the provision.")  "[A]fter a conclusion that the statute

is ambiguous . . . the court [may] turn to the legislative history."  United

States v. Kaluza, 780 F.3d 647, 658 (5th Cir. 2015).  Unfortunately "there is

no relevant legislative history" to infer Congress' intent and meaning of a

"bona fide commission."  Yi v. Sterling Collision Ctrs, Inc., 480 F.3d 505,

508 (7th Cir. 2007) (finding that there is no relevant legislative history).

However, the Department of Labor has promulgated certain regulations

interpreting a "bona fide commission" under the FLSA.

Federal regulations state "[c]ommissions (whether based on a

percentage of total sales or of sales in excess of a specified amount, or on

some other formula) are payments for hours worked."  29 C.F.R. § 778.117.

The regulations also explain that employees paid by commission are

14

"generally employed in so-called 'big ticket' departments and those establishments . . . where commission methods of payment are traditionally used." 29 C.F.R. § 779.414.  The regulations provide a non-exhaustive list of traditional retail and service establishments that compensate by commissions; this list does not include personal fitness trainers or an analogous position.  Id.  Finally, federal regulations provide two non-exhaustive examples of compensation plans that do not qualify as bona fide commissions: (1) a plan where the formula for computing commissions is such that the employee always or almost always earns the same fixed amount of compensation for each workweek; and (2) a plan where the employee receives a regular payment, constituting nearly his entire earnings, that is expressed in terms of a percentage of the sales which the business can always be expected to make; his wages are increased only slightly by a small percentage of sales above the expected quota.  29 C.F.R. § 779.416 (c).  Neither party disputes, nor do the facts suggest, that the Gold's Gym compensation plan falls into either of these prohibited commission categories.

"If a statute is ambiguous, the court is only required to defer to an agency's interpretation that reasonably effectuate[s] Congress's intent." Freeman v. Quicken Loans, Inc., 626 F.3d 799, 805 (5th Cir. 2010) (internal

quotations omitted).  In this case, since no relevant legislative history exists about the meaning of a "bona fide commission," there is no relevant Congressional intent for the Department of Labor to effectuate.  Further, the regulations do not directly define a "bona fide commission" and do not provide the Court sufficient guidance to determine the parameters of such a compensation scheme.   Therefore, the regulations lack "the force of law" and the Court will only grant deference to the regulations "with respect proportional to [their] 'power to persuade.'"  Id. (quoting United States v. Mead, 533 U.S. 218, 235 (2001)).  Working within this statutory and regulatory black hole, three circuits have attempted to define what constitutes a "bona fide commission" under § 207(i).

In 1987, the Seventh Circuit found a compensation scheme where waiters received an hourly wage and shared the 18% service charge added to each banquet bill to be a commission.  Mechmet, 825 F.2d at 1177. The Mechmet court attached significance to the fact that the waiters were not marginalized workers who needed the protections of the FLSA, that they were employees of a "big-ticket department" (banquets), and the nature of the banquet business lends itself to irregular hours, because work is tied to the demands of consumers.  Id.

In 2001, the Eleventh Circuit found a compensation scheme to be a "bona fide commission" because it "provide[d] workers with an incentive to work quickly." Klinedinst v. Swift Investments, Inc., 260 F.3d 1251, 1256 (11th Cir. 2001).  There, the employee was assigned a "flag rate" for each task, which was simply an estimate of the time the task typically takes to complete.  Id. at 1254.  The company calculated the employee's compensation by multiplying the "flag hours" completed by each employee by his or her hourly rate of pay.  Id.  Accordingly, "[t]he flag rate of pay was not the hours of time it actually took the worker to complete a job.  It [was] the method of providing employees with an incentive to 'hustle' to finish their jobs in order to obtain a larger number of jobs for greater compensation."  Id. at 1254−55.

In 2007, the Seventh Circuit found a bona fide commission existed where auto mechanics were paid in a similar fashion.  Yi, 480 F.3d at 509.  There, an auto body shop calculated the number of hours typically required to perform a given task ("book hours") and multiplied that number by a dollar figure.  A team of mechanics would be assigned a task and each worker would keep track of their actual hours spent on the assignment. Once the laborers completed the job, the auto body shop calculated their compensation by multiplying (1) the number of booked hours for the task by

(2) the ratio of the team member's actual hours worked to the total hours

worked by the team by (3) that employee's wage rate, which was based on

his or her skill level.  Yi, 480 F.3d at 509.

In considering whether the auto mechanics' compensation

scheme was a bona fide commission, the Yi court found it important that

> [T]he faster the team works, the more it earns per number of hours, since its commission is based not on the total number of hours it puts in on a job but on the number of booked hours times each team member's [personal rate based on his or her skill level]. That is how commissions work: they are decoupled from actual time worked.

Id. at 509.  The Yi court also found that a bona fide commission is one

where "the relation [between income and hours worked] is unlikely to be a

regular one."  Id. at 508.

In 2010, the Third Circuit held that a compensation system was

a bona fide commission where employees received a flat-rate per sale.

Parker, 620 F.3d at 283.  There, the Third Circuit held "when the flat-rate

payments made to an employee based on that employee's sales are

proportionally related to the charges passed on to the consumer, the

payments can be considered a bona fide commission for purposes of

§ [20]7(i)."  Id.  Further, the Third Circuit agreed with the Seventh Circuit

that a "hallmark" of a commission is that it is "decoupled from time actually

worked."  Id. at 284.

The Seventh Circuit more recently held that window-washers were paid under a bona fide commission system.  Alvarado v. Corp. Cleaning Servs., Inc., 782 F.3d 365, 368 (7th Cir. 2015).  There, the window-washers were paid under a similar compensation scheme as the auto-workers in Yi: upon receiving a window-washing order, the company assigned "points" to the job based on its perceived difficulty.  Id. at 366.  The company compensated the window-washer by multiplying the number of points the washer worked by an hourly rate specific to that worker.  Id. at 367.  Accordingly, the faster a window-washer worked, the more points he or she could accumulate and thus increase compensation for that pay period.  The Alvarado court found it important that "commission-compensated work involve[ed] irregular hours of work."  Id.  Indeed, the court wrote that "[a]n employee who is paid by the sale is not a commission worker if his sales are made at a uniform rate (e.g. one sale per hour), so that the ratio of his hours worked to his pay is constant."  Id. at 368.  Unlike a piece-rate worker[2], window-washers "can work only when [the company] is hired to wash a building's windows.  Employment is necessarily irregular (rather than the

_____

[2] A piece-rate worker is one who is paid by the item produced instead of by the item sold.  Thus a piece-rate worker is paid for making an item even if the item is not sold, while a commission-based worker is paid only when he makes a sale.  Piece-rate workers do not qualify for the § 207(i) exemption.  See Alvarado, 782 F.3d at 367; Yi, 480 F.3d at 510.

19

standard eight-hour workday) . . . because of the peculiar conditions of the window-washing business." Id.

District Courts across the country have discussed a variety of compensation plans and whether they fit within the bona fide commission definition under the FLSA.  See Owopetu v. Nationwide CATV Auditing Servs., Inc., No. 5:10-CV-18, 2011 WL 883703, at * 4−5 (D. Vt. Mar. 11, 2011); Charlot v. Ecolab, No. 12-CV-4543, 2015 WL 5774984, at * 21 (E.D.N.Y. Sept. 2015).  In Charlot, the District Court found a compensation plan to be a bona fide commission where the commission was tied to customer demand, Charlot, 2015 WL 5774984 at *17, and the scheme incentivized the employee to work more efficiently so that compensation was decoupled from actual time worked. Id. at 18, 21.   In Owopetu, the court reasoned the compensation qualified as a bona fide commission because: (1) the commissions provided incentive to the employees to work faster and more efficiently, because technicians could increase their pay by completing more work orders; (2) the commissions were proportional amounts paid by the consumer; and (3) compensation was tied to customer demand and the quantity of sales, even though plaintiff himself was not involved in sales. Owopetu, 2011 WL 883703 at * 4.  A U.S. District Court in Texas has held that for purposes of the FLSA, "payment to an employee is

a commission if it is based on a percentage of the charge to the customer."

Cantu-Thacker v. Rover Oaks, Inc., No. H-08-2109, 2009 WL 1883967, at

* 4 (S.D. Tex. June 30, 2009).

Construing these cases, the Court finds that certain

characteristics exist that define a bona fide commission.  First, a bona fide

commission is either a percentage or proportion of the ultimate price passed

on to the consumer.  See Parker, 620 F.3d at 283; Yi, 480 F.3d at 508.

Second, a bona fide commission is decoupled from actual time worked, so

that there is an incentive for the employee to work more efficiently and

effectively.  See Parker, 620 F.3d at 284; Yi, 480 F.3d at 509; Charlot, 2015

WL 5774984 at 18.  Third, the type of work is such that its "peculiar nature"

does not lend itself to a standard eight-hour work day.  Alvarado, 782 F.3d at

368.  Fourth, the compensation system must not offend the purposes of the

FLSA.[3]  Id.  No factor appears dispositive in the case law, but the first two

seem to carry the most weight.  Finally, in determining whether a

compensation scheme is a bona fide commission, a court should keep in

mind that under the FLSA, "exemptions are narrowly construed."

Cleveland, 388 F.3d at 526.

---

[3] Perhaps this was the Congress's meaning of a "bona fide" commission−one that is made in "good faith".  Bona Fide, Black's Law Dictionary (10th Ed. 2014).

Extending the rationale here, the undisputed evidence establishes that trainers were paid a percentage of the fee paid for the session.  (Dkt. # 64-2; "Casanova Dep.," Dkt. # 65-4 at 66:18−24.)  This fact would seem to indicate the existence of a bona fide commission compensation scheme.  However, trainers were not paid the percentage upon negotiating and executing a sale[4], but only upon spending an hour with the client during the actual training session.  ("Marques Dep.," Dkt. # 64-4 at 13:20−23, 14:8−24.)  Accordingly, there was no way for trainers to work more effectively or efficiently−trainers were only able to earn their percentage by working an hour-long session with a client.  Therefore, the compensation system was not decoupled from time.  Instead, a one-to-one correlation existed between the hours a trainer worked and his or her compensation.[5]  Such a compensation system reflects nothing more than an hourly wage, where the employee's rate of pay changes based upon his or her qualifications. This is not a commission.

---

[4] Indeed, Gold's Gym dispensed with paying trainers a percentage of their gross sales of membership packages and physical training sessions in late 2011. (Copeland Dep. 33:1−25.)

[5] The Court finds it <u>de minimis</u> to the compensation scheme's characterization that trainers still received their percentage of the fee where clients cancelled within 24-hours or did not show up for a scheduled session and thus did not have to work an hour.

Defendant argues that since the nature of the personal trainer business is tied to customer demand and irregular hours, the scheme more closely resembles a bona fide commission.  (Dkt. # 13−17.)  The Court finds this argument unpersuasive.  Gold's Gym is open for a limited number of hours per day.  (Copeland Aff. ¶ 10.)  This means that Defendant could schedule regular work-hours for its trainers to conduct sessions and complete all the other tasks typically performed during "floor hours."  While it is true that the quantity of sessions is directly tied to customer demand, the demand present in this case is distinguishable in a relevant way from the demand found in the facts presented to the other circuits.  The Yi court and the other circuit court decisions found the existence of customer demand important where the employees could process or service such demand at a faster pace and thereby increase their pay by servicing more customers per hour.  For example, if customer demand increased for the auto-workers in Yi, employees could work faster to fix more cars per hour and earn more money, because they were paid a percentage per task.  Here, trainers cannot work more effectively and efficiently to process customer demand because servicing a customer at Gold's Gym must be done in one-hour increments.  Put simply, trainers cannot process demand for a training session any faster than the time it takes to complete a session. Therefore, the existence of

customer demand in this case does not indicate the existence of a bona fide

commission.  Instead, customer demand in this case reinforces the

conclusion that the payment system is not decoupled from time and thus not

a bona fide commission.

Defendant also argues that the compensation scheme provided

performance-based incentives for trainers to increase their income.  (Dkt.

# 65 at 17−19.)  Defendant misconstrues the application of performance-

based incentives in the case law to bona fide commissions.  For example, the

window-washers in Alvarado had a performance-based incentive to clean

windows in a rapid fashion to accumulate more income.  Here, trainers have

an incentive to earn more national certifications because a greater amount of

certifications results in earning a greater percentage of the training session

price paid by a gym member.  Clearly, this is not a performance-based

system, but is instead a qualification-based system; one that is unlike all

other incentive structures in the relevant case law.  This qualification-based

system does not incentivize trainers to work faster and thus earn more

commission-based income.  Instead, the qualification-based incentives under

these facts simply qualify the trainer to earn a higher hourly-rate.  This is not

a commission.

There is some contention that the compensation scheme is a bona fide commission because trainers negotiate their own rates. The Court does not disagree that trainers negotiate their own rates per session. However, individually negotiated rates would be germane to finding a bona fide commission if the trainer received payment upon completing the sale of a session. That is not the case here. Instead, trainers may negotiate the price of the sale, but they do not earn their percentage until conducting a session with a client. Accordingly, trainers are simply negotiating a higher hourly rate with the client that is earned only after working the hour-long session.

Finally, the purposes of the FLSA are to remove labor conditions that are detrimental to the health and safety of workers, to spread employment opportunity among many workers to reduce unemployment, and to increase the welfare of low paid workers. See 29 U.S.C. § 202(a); Yi, 480 F.3d at 510. The lead Plaintiff, Daniel Casanova, earned over $90,000 in 2012, one of the years encompassed by this lawsuit. (Dkt. # 67-15 at 21.) The Yi court noted that the named plaintiffs in that case did not require the protections of the FLSA because they made more than $60,000 a year. Accordingly, this Court finds that the compensation scheme does not violate the purposes of the FLSA for a trainer like Casanova. However, evidence exists in the record that other trainers did not make nearly as much money as

Casanova and worked a significant amount of hours for which they did not receive compensation.  (See "Lucero Dep.," Dkt # 64, Ex. 8 at 57:18−24, 58:20−24; "Saul Dep.," Dkt. # 64, Ex. 9 at 36:22−25, 37:1−10; "Llewellyn Dep.," Dkt. # 64, Ex. 10 at 20:9−14; "Koehler Dep," Dkt. # 64, Ex. 7 at 23:7−17.)  Such evidence indicates that the compensation scheme may offend the purposes of the FLSA because it created a labor condition requiring workers to work excessive hours without compensation.  This characteristic weighs against the Court finding the Gold's Gym compensation plan a bona fide commission.

Accordingly, upon considering the characteristics of a bona fide commission and construing the exemption narrowly as the Court must, the Court finds as a matter of law that Gold's Gym's compensation system for trainers is not a bona fide commission.  Therefore, Defendant may not claim the § 207(i) exemption and assert it at trial.

Since the Court finds that the compensation scheme at issue is not a bona fide commission, the Court need not reach the remaining elements necessary to qualify for an exemption under § 207(i), namely whether "the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him," and whether "more than half of [an employee's] compensation for a representative period

26

(not less than one month) represents commissions on goods or services."  29 U.S.C. § 207(i).

CONCLUSION

For the reasons explained above, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment.  Defendant may not, as a matter of law, defend against alleged violations of the FLSA at trial by claiming the exemption set forth in 29 U.S.C. § 207(i) because the instant compensation scheme is not a bona fide commission.

**IT IS SO ORDERED**

**DATE:** San Antonio, Texas, March 23, 2016.

_____

DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE